## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

FOREST GUARDIANS,
a nonprofit, New Mexico Corporation,

      Plaintiff,

vs.                                                                      No. CIV-02-1003   JB/WDS

UNITED STATES DEPARTMENT OF
INTERIOR, BUREAU OF LAND
MANAGEMENT,

      Defendant,

NEW MEXICO PUBLIC LANDS
COUNCIL, and NEW MEXICO CATTLE
GROWERS' ASSOCIATION, both non-
profit organizations on behalf of their
respective members,

      Defendant-Intervenors.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on the Plaintiff's Motion for Summary Judgment,

filed August 19, 2003 (Doc. 15). The primary issue is whether the Defendant United States

Department of Interior, Bureau of Land Management ("BLM") violated the Freedom of Information

Act ("FOIA"), 5 U.S.C. § 552, by: (i) withholding agency records allegedly responsive to the Plaintiff

Forest Guardians' FOIA request; and (ii) refusing to grant Forest Guardians' fee waiver request for

those records. Because the Court finds the information that Forest Guardians seeks in this action is

subject to disclosure under the FOIA, the Court will grant Forest Guardians' motion for summary

judgment in part and order the BLM to promptly release appropriately redacted copies of the

lienholder agreement records that Forest Guardians seeks.  Because the Court finds the information that Forest Guardians seeks will not significantly contribute to public understanding of government operations and activities, the Court will deny Forest Guardians' motion for summary judgment in part and order that the BLM may properly assess fees related to Forest Guardians' request pursuant to the applicable statutory and regulatory authority.

## BACKGROUND

**1.     Forest Guardians**

Forest Guardians is a New Mexico non-profit public-interest conservation organization that attempts to serve the public interest by increasing the general public awareness of public lands management issues confronting federal agencies with responsibility over public land, water, and fish and wildlife habitat.  See Complaint for Declaratory and Injunctive Relief ¶ 4, at 2, filed August 13, 2002 (Doc. 1)("Complaint").  One of Forest Guardians' primary missions is to acquire, compile, and analyze information and data regarding natural resources on federal public lands in the western United States, and on federal activities and federally permitted activities on those lands, including timber sales, cattle grazing, water management, and recreational development.  See id. ¶ 5, at 2.  Forest Guardians then disseminates that information to its members, the general public, and public officials through publications, reports, its web site and newsletter, general news media coverage, and public presentations.  See id.  Forest Guardians alleges that its successful efforts at educating the public on public lands issues contribute significantly to the public understanding of governmental operations and activities.  See id.

**2.     The Bureau of Land Management and the Defendant-Intervenors**

The BLM is a bureau of the United States Department of Interior.  The BLM is responsible

for administering various public lands throughout the United States, and is also responsible for authorizing activities on those lands, including the grazing of cattle by private parties, which affects associated fish, wildlife, and other natural resources on those publicly-owned lands.  See Complaint ¶ 7, at 2; Answer ¶ 7, at 2 (admitting).  The BLM is responsible for responding to FOIA requests made to it.  See Complaint ¶ 7, at 2; Answer ¶ 7, at 2 (admitting).

The New Mexico Public Lands Council ("NMPLC") and the New Mexico Cattle Growers' Association ("NMCGA")(collectively "Intervenors") are both non-profit organizations that have intervened as defendants in this action on behalf of their respective members.  In support of their motion to intervene, the Intervenors submitted affidavits from several of their members.  See Notice of Filing Signed Original Declarations, filed September 16, 2003 (Doc. 22).  Two of the affiants are grazing permittees who have pledged their permits as collateral for bank loans.  See Declaration of Randall G. Major ¶ 9, at 2 (executed August 11, 2003); Declaration of Jim Embree ¶ 8, at 2 (executed August 18, 2003).  The affidavits contain information regarding the permittees' involvement in the lienholder agreement process, including the name of the financial institution that issued their loans.  See Major Declaration ¶ 7, at 2; Embree Declaration ¶ 6, at 1-2.  The Intervenors did not submit additional affidavits after the Court granted their motion to intervene.

The only other evidence that the Intervenors put into the record was a newspaper article filed with the Court on the day of the hearing on Forest Guardians' motion for summary judgment.  See Notice of Supplemental Authority, filed February 4, 2004 (Doc. 44).  The article discusses Forest Guardians' attempts to eliminate grazing on public lands.  While the Intervenors submitted the entire article, they specifically brought the following portions to the Court's attention:

Indeed, the Guardians' most controversial tactic is to single out the financially

vulnerable -- ranchers who have used their permits as collateral for bank loans, a common form of financing for small ranching operations. "We want to put the squeeze on ranchers to get off the land," says John Horning, the coordinator of the Guardians' antigrazing campaign. "If some ranchers go out of business along the way, so be it."

To find ranchers with grazing-permit loans, the Guardians use the federal Freedom of Information Act to get the names of participants in what's known as the escrow-waiver loan program.

Under the program, the U.S. government provides banks with verification of ranchers' grazing permits, so banks can accept the numbers of livestock allowed to feed under the permits as collateral for business loans. In the past 20 years, banks have issued more than $450 million in grazing-permit loans to about 300 ranching operations, according to records obtained by the Guardians.

. . . . But critics say the Guardians go after loan-holders more often than not and acknowledge the tactic can be effective. "It doesn't take a mathematician to figure out how many head of cattle it takes for the rancher to make his bank note," says G.B. Oliver III, an executive at the Western Bank of Alamogordo, in Alamogordo, N.M., which gave the Gosses a $170,000 loan in 1989, with the 553 cows then on their grazing permit as collateral.

Carlton, Jim, "Aiming to Save Species Hurt by Grazing Cattle, The Forest Guardians Target Ranchers in Debt," Wall Street Journal (dated November 11, 2002).[1]

The Intervenors participated in briefing with respect to Forest Guardians' motion for summary judgment, as well as oral argument. At the hearing regarding the motion, both the BLM and the Intervenors expressed concern that Forest Guardians would use any disclosed information to identify specific ranchers. See Transcript of Motion Proceedings at 51:22 to 52:7; id. at 65:10-13 (February 4, 2004)("Transcript").[2] The BLM and the Intervenors conceded, however, it would not be possible

---

[1] The escrow-waiver loan program discussed in this article is the equivalent of the lienholder agreement program at issue in this case. The escrow-waiver loan program, however, involves the Forest Service rather than the BLM.

[2] The Court's citations to the transcript refer to the Court Reporter's original, unedited version. Any finalized transcript may contain slightly different page and/or line numbers.

to identify specific ranchers from aggregate loan amounts.  See id. at 51:4-21; id. at 64:7-17.  In

response to factual questions from the Court, the BLM and the Intervenors were unable to explain

how Forest Guardians could use redacted lienholder agreements to match loan amounts to specific

ranchers.  See id. at 52:8-18; id. at 65:14-23.  They were also unable to inform the Court of the

likelihood that any given BLM field office contained only one rancher with a grazing permit.  See id.

at 56:6-10; id. at 65:14-23.

    **3.**       **The FOIA Requests**

Forest Guardians submitted FOIA requests to each of the ten BLM state offices in the western

United States on July 31, 2000.  Forest Guardians submitted a substantially identical FOIA request

to the Arizona, California, Colorado, Idaho, Montana, New Mexico, Oregon, Nevada, Utah, and

Wyoming BLM state offices.  The FOIA requests sought a wide range of information about liens in

which permittees pledged their grazing permits as collateral for a loan.  In the requests, Forest

Guardians sought:

> (a) Copies of all documents, which are "collateral assignments" of all grazing permits
> for all grazing allotments in the state.  This includes, but is not limited to, any and all
> "notices of lien holder's interest", "promissory notes", or any and all other documents
> which refer to the use of a federal grazing permit as a lien or collateral security for a
> loan.  In particular we are interested in knowing the names of allotments, permit
> holders, names of lending institutions and amount of money involved in each
> individual agreement.

> (b) Any and all letters from financial/lending institutions concerning livestock grazing
> on BLM lands.  In particular, we are interested in any letters from lending institutions,
> which address BLM management efforts to restore degraded land.

> (c) Any and all letters from the BLM to financial/lending institutions concerning
> management of livestock grazing on public lands.

> (d) Any and all BLM databases which identifies which permits on which allotments
> are utilized as collateral.  Any and all BLM memos, letters of communication that

address the use of BLM grazing permits as collateral security for loans.

Forest Guardians' FOIA Requests (July 31, 2000).

Of particular significance in this case, Forest Guardians' FOIA requests sought copies of all BLM "lienholder agreements" for all grazing permits on all BLM lands in the western United States. See id. A "lienholder agreement" is a document that evidences an agreement between a grazing permittee and a financial institution whereby the grazing permittee pledges his or her privilege to graze livestock on federal lands as additional security for loans. The document contains personal financial information about the grazing permittee, including the permittee's name, the location of the grazing allotment that the permittee uses, the name of the financial institution loaning money to the permittee, the amount of the loan, the date of the loan, payoff dates and amounts, and identification of any additional collateral pledged by the permittee. The BLM holds these "lienholder agreements" in its files. Because Forest Guardians' administrative appeals did not challenge the BLM's responses to the portions of its FOIA requests for records other than the lienholder agreements, the agency records at issue in this proceeding are limited to the lienholder agreements.

The records at issue in this case, also known as "collateral assignments," are documents that third parties -- primarily banks and other lending institutions -- submit voluntarily to the BLM. Section 3 of the Taylor Grazing Act of 1934, 43 U.S.C. § 315b, authorizes the Secretary of the Interior, through the BLM, to issue permits for grazing livestock on grazing districts on public lands. The Act also contemplates that grazing permittees may use their permits as collateral to secure a loan, but it gives the Department no role in any such transaction between the permittee and the lender. See id. ("[N]o permittee complying with the rules and regulations laid down by the Secretary of the Interior shall be denied the renewal of such permit, if such denial will impair the value of the grazing

unit of the permittee, when such unit is pledged as security for any bona fide loan.").

The Department's grazing regulations provide that the BLM is to notify lienholders of record when the BLM receives an application to transfer a grazing permit from one base property to another. See 43 C.F.R. § 4110.2-3(c); id. at § 4110.2-1(a)(defining "base property"). Under the regulations, the BLM also notifies the lienholder of record when the BLM takes action that might affect a grazing permit's value. The regulations also provide, however, that, "[w]hile grazing permits or leases may be pledged as security for loans from lending agencies, this does not exempt these permits or leases from the provisions of these regulations." 43 C.F.R. § 4130.9.

Forest Guardians' FOIA requests each contained a request for a waiver of any fees associated with processing the request, along with information intended to establish Forest Guardians' entitlement to a fee waiver under the FOIA. See FOIA Requests. In support of its fee waiver requests, Forest Guardians submitted an explanation concerning both the public significance of the BLM's facilitation of the use of lienholder agreements and of the resulting collateralization of public lands grazing permits. See id. Forest Guardians also described its intent and ability to publicly disseminate information contained in the requested records to allegedly contribute significantly to the public's understanding of the BLM's operations and activities. See id. The requests also included a description of Forest Guardians' non-profit status and lack of any commercial interest in the records sought. See id.

> Finally, Forest Guardians intends to compile all information about livestock grazing, the use of grazing permits as collateral for loans, areas of critical environmental concern, stream resources and other sensitive lands and place the information onto our web page. In particular, we intend to establish an interactive grazing web site in which members of the public will be able to click on regions of the West and obtain as much information as they are interested in about the status of ongoing livestock grazing on public lands. In particular we intend to have all grazing allotment

boundaries in a map on our web page.  The map will enable people to click on an individual allotment and then be linked to our grazing database which will provide information about the status of that allotment's compliance with environmental laws, the condition of streams on that allotment and the overall condition of sensitive and threatened fish and wildlife in the area.  In this way and for this reason we believe that all the significant information that we are requesting will very likely contribute to public understanding.

Id. at 2.

### 4.    BLM's Responses to the FOIA Requests

Between August 24 and September12, 2000, eight of the BLM's ten state offices responded by letter to Forest Guardians' July 31, 2000 FOIA requests.  See Complaint ¶ 11, at 3.  Two BLM offices, the New Mexico and Nevada state offices, initially did not respond in any way to the requests, but later responded as well.  See id. at ¶¶ 11,13 at 3-4.  Each one of the BLM state offices responded in a detailed and nearly identical fashion to Forest Guardians' July 31, 2000 FOIA requests by refusing to provide the information sought and by refusing to grant the fee waiver request.  See id.

With respect to Forest Guardians' request for a fee waiver, the BLM identified the applicable statutory standard as follows:

The FOIA permits documents to be furnished without charge or at a reduced charge if disclosure of the information:

(a) is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Government, and

(b) is not primarily in the commercial interest of the requester.

FOIA Response at 2.  The BLM concluded that Forest Guardian's fee waiver request met part (b) of the standard but failed to meet part (a).  Thus, the BLM denied the fee waiver.

In explaining its denial of the fee waiver, the BLM first considered whether the collateral assignments concerned "the operations or activities of the government."  The BLM's letters to Forest

Guardians observed that the release of these collateral assignments, which third parties voluntarily submit to the BLM, show no particular BLM activity or program. Thus, their disclosure would not cast light on the BLM's operations and activities:

> Using the base property with the attached Federal grazing preference and permitted use as collateral security for a loan is a private transaction between a permittee and a financial lending institution. A grazing permittee is not required by law to notify BLM when they have a lien holder on their grazing permit. By policy, however, the BLM will accept a notice from a lien holder and, in compliance with section 3 of the Taylor Grazing Act, the BLM will notify the lien holder of record concerning any adverse actions that the BLM is taking on the preference or permitted use. During the processing of an application to transfer ownership of encumbered base property, or to transfer preference from the encumbered base property to another base property, the BLM requires the approval of the lien holder of record before the application may be approved. Therefore, the requested records have little bearing on the operations or activities of the Government outside of notice of an action that would affect the status of the preference and permitted use.

FOIA Response at 2.

Next, the BLM considered whether the disclosure of the records was likely to contribute to public understanding of the operations and activities of the government and, if so, whether that contribution would be significant. Here again, the BLM explained the factors underlying these tests and explained further that Forest Guardians' requests did not qualify for a fee waiver. The BLM asserted that release of the lien documents showing that a permittee had pledged his or her grazing permit as collateral for a loan would not contribute to the public's understanding of how the BLM performed its duties:

> The Department's guidelines address significance as having a contribution to public understanding that will be significant if the information disclosed is new, and clearly supports public oversight of Department operations. A significant contribution is not likely to arise from disclosure of information already in the public domain.
>
> As discussed under item 1 above, the requested records in this case do not concern the operations and activities of the BLM in general but are for a very narrow

> administrative requirement to recognize the existence of a lien and to notify the lien
> holder of record when adverse actions or transfers are pending.  The administrative
> practice has no bearing on the management and improvement of public rangelands.

As a result, the requested records are not likely to contribute to public understanding of the operations and activities of the BLM, much less contribute significantly.  Therefore, the second and third items, whether disclosure is likely to contribute to public understanding of these operations and activities, and whether the contribution will be significant, become minimal factors.  Your fee waiver request, also, does not state how these requested records would contribute significantly to the public's understanding of the grazing management program of the BLM.

FOIA Response at 3.

        In addition, each of the BLM state offices' responses to Forest Guardians' FOIA requests went on to substantively deny the request for copies of lienholder agreements.  The BLM's sole stated rationale for withholding the lienholder agreements was that, because the information contained in the lienholder agreements does not concern the BLM's operations and activities, the release of any of the information therein would constitute a clearly unwarranted invasion of personal privacy under Exemption 6 of the FOIA, 5 U.S.C. § 552(b)(6).  See id. at 4.  Thus, the BLM withheld the lienholder agreements in their entirety.

        With respect to Forest Guardians' request for copies of correspondence between the BLM and financial institutions, the BLM stated that it would release such letters with personal information redacted.  See id.  With respect to Forest Guardians' fourth and final category of requests, for databases that identify the permits on which allotments are used as collateral, the BLM gave a "no records" response, stating that "BLM does not have a database which identifies which permits on which allotments are utilized as collateral."  Id.  Each letter from a BLM state office to Forest Guardians included an estimate of the cost and of the numbers of files that the BLM would need to search within each state office and the field offices under its jurisdiction to respond further to Forest Guardians' requests.

### 5.    The Administrative Appeals

Forest Guardians filed two administrative appeals.  On September 26, 2000, Forest Guardians filed a consolidated administrative appeal of the various BLM state offices' eight initial responses to the July 31, 2000 FOIA requests.  See Complaint ¶ 12, at 4.  These eight offices had responded by that time.  Subsequently, Forest Guardians filed a nearly identical administrative appeal of responses to its FOIA requests by the BLM's New Mexico and Nevada state offices.  Forest Guardians filed the administrative appeals to contest the agency's refusal to grant the fee waiver request and the BLM's withholding of the collateral assignments from release under Exemption 6 of the FOIA.

In addition to the information that Forest Guardians had submitted to the BLM in its original FOIA requests, both of Forest Guardian's administrative appeals contained additional information designed to establish Forest Guardians' eligibility for the requested fee waiver.  See FOIA Appeal at 3-5.  In particular, the appeals contained an explanation of the public significance of the use of lienholder agreements to collateralize BLM permits:

> Forest Guardians has requested information about a BLM policy of permitting loans, that are in large part based on the number of cows allowed under a permit issued by the BLM.  The result of this policy is twofold.  First, livestock permit holders have been able to approach lending institutions with grazing permits as collateral.  Thus, livestock permit holders are borrowing money based on permits to graze land that is owned by the American people.  Grazing permits, contrary to public perception are privileges and not rights, thus the decision to allow [liens] on permits and the paperwork that is the result of that policy is clearly a matter of significant public interest.  The second result of the [BLM lienholder] policy is that lending institutions have become staunch proponents of the status quo in grazing management.  They are opposed to any and all changes to the terms and conditions of permits if those changes would undermine the loan.

Id. at 2.

As additional evidence of the public significance of the BLM's policy of facilitating the use

of lienholder agreements, Forest Guardians' administrative appeals included, as an attached exhibit,
a copy of a legal brief submitted in another lawsuit.  See Public Lands Council v. Babbitt, No. 98-
1991, Amicus Brief of State Bank of Southern Utah at 3-5 (U.S.S. Ct. 1999).  The brief documented
the financial scope of private lending using public lands grazing permits as collateral, as well as the
manner in which that policy and practice by federal agencies creates expectations and pressures to
maintain the status quo on BLM and other public grazing allotments despite environmental and other
concerns.  See id.  The factual statements contained in this document, which Forest Guardians
specifically cited in its administrative appeal, included:

> [The] livestock industry and banking entities apparently believe that "grazing
> preference rights alone have an aggregated value of approximately $1 billion dollars,"
> on BLM lands . . . .  Further they state that "many ranchers rely on federal grazing
> permits for most of their debt security.  In some cases the permits represent up to 95
> percent of the security."

FOIA Appeal at 2 (quoting Amicus Brief).

Forest Guardians emphasized that the documents it sought involved specific allotment
information, specific permittees, and specific loan amounts for each permittee.  It argued: "We
strongly disagree with agency's assessment that disclosure of which allotments, how many allotments,
which permittees and what banks have lien holders agreements on millions of acres of public lands
involving approximately $1 billion dollars to be an insignificant matter."  Id. at 3.  Forest Guardians
limited the scope of its administrative appeals to the BLM's denial of the request seeking the
collateral assignments records and denial of the fee waiver request.  Forest Guardians did not
administratively appeal the BLM's disposition of the second, third, and fourth categories of records
of its initial FOIA requests.  As of the date Forest Guardians filed the Complaint in this proceeding
on August 13, 2002, the Department of Interior had not issued a determination on Forest Guardians'

-12-

FOIA appeals.  See Complaint ¶ 15 at 4; Answer ¶ 15 at 2 (admitting allegations).

**6.    Related Proceedings**

        **a.    <u>Forest Guardians v. United States Forest Service & Production Credit Association of New Mexico</u>**

        Both the information at issue and the legal issues presented for resolution in this proceeding are substantially identical to those that Forest Guardians previously litigated in a recently concluded proceeding brought in this District against the United States Forest Service.  See <u>Forest Guardians v. United States Forest Serv. & Prod. Credit Ass'n of New Mexico</u>, Civ. No. 99-615 M/KBM, pleadings (D.N.M., decided January 29, 2001)(subsequently reassigned to the Honorable James A. Parker, United States District Court).  The earlier litigation arose from FOIA requests that Forest Guardians submitted to the Forest Service in Washington, D.C. and to its regional offices for information regarding the pledging of grazing permits as collateral.

        In <u>Forest Guardians v. United States Forest Service</u>, the Forest Guardians sought copies of "escrow waivers," a document that essentially serves the same purpose as, and is virtually identical to, the "lienholder agreements" at issue in this case.  Unlike the BLM, however, the Forest Service administrators an escrow waiver program under a 1938 Memorandum of Understanding with the Farm Credit Administration.  See Civ. No. 99-615, Memorandum Opinion and Order at 2, filed January 12, 2001 (Doc. 179).

        When the Forest Service received Forest Guardians' FOIA requests, it did not adopt a consistent response among its regional offices.  Some Forest Service regional offices released the requested information, including names of permittees and loan amounts, while other Forest Service regional offices withheld the information in full.  By contrast, in this case, the ten BLM state offices

uniformly denied Forest Guardians' fee waiver request and declined to release any records.

After Forest Guardians filed its suit against the Forest Service, several third parties intervened as defendants, including retail lenders, wholesale lenders within the Farm Credit System, and ranchers, farmers and agricultural producers holding federal grazing permits.  See id. at 6.  In Forest Guardians v. United States Forest Service, the NMPLC and the NMCGA intervened and successfully prevented any further release of the personal financial information that the "escrow waivers" contained.  See id. at 44.

The Honorable Edwin L. Mechem, Senior District Judge, criticized  the inconsistent manner in which the various Forest Service regional offices responded to the requests.  Judge Mechem ruled that some Forest Service regional offices had failed to give sufficient weight to privacy interests under Exemption 6 of the FOIA and mistakenly released information that they should have withheld.  Judge Mechem found that the release of the requested information would not significantly increase public knowledge of the Forest Service grazing program and would violate the permittees' privacy.  Judge Mechem stated that the information about individual names and loan amounts did not shed any light upon the government's performance of its duties and was exempt from mandatory disclosure.  See id. at 41.  Judge Mechem reached this conclusion because the Forest Service did not have any role in the escrow waiver program.  See id. at 42.

> Neither the Forest Service nor any of the Intervenor-Defendants in this case who seek to preclude disclosure deny that the Forest Service permits federal grazing permits to be used as collateral for private loans.  The point is fully conceded.  With the publication of what has been released to this time, the point is also well proven.  The question now is whether additional escrow waiver information adds anything at all to the public's knowledge of how *the Forest Service* functions.  I don't see that it does. I conclude that personal information, including name and residential address, and personal financial information consisting of loan amounts and due dates, the date an individual mortgaged property and livestock and, except for the federal grazing

permit, a description of the property pledged as collateral are all protected by FOIA from mandatory disclosure and are not to be released.

Id. at 44 (emphasis in original).

The Forest Service, Forest Guardians, and the Intervenor-Defendants subsequently reached a voluntary settlement of the remaining issues in the litigation. As a result of the final settlement that the Court approved in that proceeding, the Forest Service agreed to release redacted information from records that the agency maintained. The information in the redacted documents that the Forest Service released is substantially similar to those records that the Forest Guardians seek in this present proceeding against the BLM.

Under the terms of the final settlement that the Court approved in Civ. No. 99-615, the information that the Forest Service released to the Forest Guardians revealed only: (i) the identity (for each National Forest) of the names of the financial institutions involved in the practice of lending using Forest Service grazing permits as collateral using "escrow waivers" that the financial institutions had submitted to the agency; and (ii) aggregated information (by National Forest) showing the total dollar amount of loans secured by Forest Service grazing permits using such escrow waiver documents. See Stipulation, filed July 6, 2001 (Doc. 191). The Court approved the settlement. See Order Approving Stipulation and Entering Final Judgment, filed July 26, 2001 (Doc. 195).

**b.      Rice v. United States**

The plaintiffs filed this related suit on December 11, 2000.  See Rice v. United States, Civ. No. 00-2960 (D.D.C.). The plaintiffs are ranchers holding grazing permits from the Forest Service. They assert claims for violation of the Privacy Act, 5 U.S.C. § 552a and allege that the Forest Service violated the Privacy Act, 5 U.S.C. § 552a, by releasing personal financial information to Forest

-15-

Guardians in response to Forest Guardians' FOIA requests.   By Memorandum Order dated November 27, 2002, the District Court for the District of Columbia, the Honorable James Robertson, certified the case as a class action.   The District Court has issued a Scheduling Order dated August 25, 2003, providing for notice to potential class members and for discovery.

**7.      Scope of Relief Sought**

When the Department of the Interior did not timely respond to Forest Guardians' administrative appeals, Forest Guardians filed its Complaint in this matter on August 13, 2002.   The Complaint challenges the BLM's decisions denying a fee waiver and withholding records under Exemption 6.   In its Complaint, Forest Guardians asserts that it is entitled to a fee waiver and release of the "reasonably segregable non-exempt information sought in the request[s]."   In its motion for summary judgment, however, Forest Guardians elected to limit the scope of the relief it requests in this proceeding.   Forest Guardians now seeks only: (i) an identification (for each BLM field office) of the names of the financial institutions involved in the practice of using BLM grazing permits as collateral; and (ii) aggregated financial information (by field office) as to the total dollar amount of loans secured by BLM grazing permits.[3]   Forest Guardians has not amended its Complaint nor asked leave of the Court to modify its original FOIA request.   At oral argument, Forest Guardians stated

---

[3] Forest Guardians does not believe that any of the information contained in the BLM's lienholder agreements is exempt from release under the FOIA as a matter of law, suggesting that it has a right to get this information at a later date.   Nevertheless, for purposes of this litigation, Forest Guardians has elected to waive its right in this proceeding to seek an Order requiring the BLM to release any purportedly private personal information concerning any individual BLM permittees who may have pledged their grazing permits as collateral for loans from financial institutions.   In so limiting the scope of the relief it requests in this case, Forest Guardians hopes to narrow and simplify the issues which the Court needs to resolve.   Forest Guardians also narrowed the scope of the relief that it sought in an attempt to avoid intervention by parties to challenge the potential release of private personal financial information concerning individual grazing permittees that the BLM's lienholder agreement records may contain.

that it would accept redacted lienholder agreements showing the name of the financial institution and the individual loan amount rather than aggregate information.  See Transcript at 77:4-14.[4]

### STANDARDS FOR MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  Under this standard, the moving party initially carries the burden of pointing out to the trial court that there is an absence of evidence to support the nonmoving party's case, although the moving party "need not affirmatively negate the nonmovant's claim in order to obtain summary judgment."   Allen v. Muskogee, Oklahoma, 119 F.3d 837, 840 (10th Cir. 1997)(citing Celotex v. Catrett, 477 U.S. 317, 322-23 (1986)), cert. denied, 528 U.S. 1148 (1998).

In ruling on a summary judgment motion, the Court examines the factual record and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  See Allen v. Muskogee, Oklahoma, 119 F.3d at 839-40.  Materiality of the facts in dispute, if any, is dependent upon the substantive law.  See id.  Once the movant has met this burden, rule 56 requires the nonmovant to go beyond the pleadings and show, through affidavits, depositions, answers to

---

[4] In support of its response to Plaintiff's Motion for Summary Judgment, the BLM submitted a declaration by Kenneth Visser, the BLM's national expert on public lands grazing administration.  In his declaration, Mr. Visser states that "[t]he BLM maintains a case record for each of its 18,088 permittees and lessees (accurate as of August 28, 2003 - the number fluctuates) in 110 field offices located throughout the western states."  Declaration of Kenneth M. Visser ¶ 8, at 3 (executed September 15, 2003).  Mr. Visser estimates that approximately 25% of the files would not contain lienholder notifications.  See id. ¶ 9, at 3. Using these numbers, and recognizing that the fields may not be evenly distributed, the Court calculates that, on average, each field office would maintain approximately 164 files.  If 75% of the files do contain lienholder notifications, approximately 123 of the 164 files in each field office would contain materials within the scope of Forest Guardians' request.

interrogatories, and the like, that there is no genuine issue for trial.  See id. at 841.  The nonmoving party may not avoid summary judgment by resting upon only the allegations or denials in the pleadings.  See Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).

**LEGAL ANALYSIS**

While the BLM and the Intervenors make a number of procedural arguments why the Court should not decide the substantive issues that Forest Guardians' motion for summary judgment raises, the Court believes the substantive issues are properly before the Court.  The parties have argued the fee waiver issue as a threshold issue, and most extensively and vigorously -- perhaps signaling to the Court what is really at issue in this case.  Because, however, the Court need not decide the fee waiver issue if it does not compel any documents, the Court will decide the Exemption 6 issue before it decides the fee waiver issue.  The BLM agrees with the Court that, if the Court does not compel any disclosure, anything the Court says on the fee waiver issue would be dicta or an advisory opinion, see Transcript at 43:25 to 44:4, which the Court tries to avoid giving.

**I.    THE COURT HAS JURISDICTION TO DECIDE THE MATTERS RAISED IN FOREST GUARDIANS' MOTION FOR SUMMARY JUDGMENT.**

The BLM and the Intervenors raise two issues with respect to the Court's jurisdiction to consider and decide the substantive issues presently before it.  First, because Forest Guardians' initial FOIA requests involved a much broader scope than the relief sought in this action, the BLM argues that Forest Guardians now seeks information that it had not previously sought from the BLM.  Accordingly, the BLM contends that Forest Guardians has not exhausted its administrative remedies.  Second, the Intervenors argue that Forest Guardians cannot limit its requested relief without formally amending its Complaint.  As discussed below, the Court disagrees with these arguments and finds that

it has jurisdiction to decide the motion.

### A.   FOREST GUARDIANS HAS EXHAUSTED ITS ADMINISTRATIVE REMEDIES.

The BLM argues that it has not had an opportunity to act on Forest Guardians' more limited request because Forest Guardians has not submitted a FOIA request for the records it now seeks. The BLM further argues that Forest Guardians' attempt to modify its request on judicial review is tantamount to a failure to exhaust its administrative remedies and that the Court should not countenance this modification.[5]

The BLM contends that the Court should give the BLM a fair opportunity to respond administratively to a modified request before the Court decides the issues the new request raises. United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952)("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."). Forest Guardians does not dispute that it must exhaust its administrative remedies before filing suit. Instead, it maintains that it exhausted those remedies by filing its administrative appeals.

The BLM does not contest that the specific information Forest Guardians seeks in its motion

---

[5] In support of the argument that Forest Guardians has failed to exhaust its administrative remedies, the BLM cites two cases from other circuits. See McDonnell v. United States, 4 F.3d 1227, 1240 (3d Cir. 1993); Oglesby v. Department of Army, 92 F.2d 57, 62-63 (D.C. Cir. 1990). These cases, however, do not support the contention that Forest Guardians' decision to narrow its scope of relief triggers the exhaustion of remedies doctrine. These cases establish that, although a requester may immediately file suit in federal court if the agency completely fails to respond to a request within the period allowed by statute, once an agency responds at least partially to a request, full exhaustion of administrative remedies is required. In this case, the agency responded to the original request, Forest Guardians filed an administrative appeal, and the agency did not render a decision on that appeal.

for summary judgment is, in fact, the same information contained in the agency's lienholder agreement records sought in Forest Guardians' original FOIA requests.  The BLM offers no factual support or testimony to support its contention that it might have come to a different administrative determination regarding Forest Guardians' FOIA and fee waiver requests if Forest Guardians had explicitly sought release of only some and not all of the information contained in the BLM's lienholder agreement records.  Similarly, there is no evidence in the record that the BLM would reach a different conclusion if given the opportunity to decide a more narrow FOIA request from Forest Guardians.  Forest Guardians notes that, despite extensive settlement discussions with the BLM before filing the motion for summary judgment, the agency specifically refused to agree to release redacted copies of the lienholder agreements in the manner that Forest Guardians requested in its motion.

The agency has a duty under the FOIA to release any and all reasonably segregable non-exempt information contained in the lienholder agreement records.  As a part of its administrative determination regarding Forest Guardians' FOIA requests, the BLM had an obligation to carefully review the lienholder agreement records and to consider the release of less than all of the information contained in those records.  This duty required the agency to consider the option of redacting some information from the lienholder agreement records to protect any arguably exempt information such as the identity of specific ranchers or their particular loans while releasing information in those records identifying the financial institutions involved in the practice of using public lands grazing permits as collateral.  This duty existed regardless whether Forest Guardians indicated a willingness to accept less than the entire contents of the BLM's lienholder agreements in the administrative proceedings.

-20-

Because the BLM had a duty under the FOIA to make a determination as to the disclosure of one or more specific categories of information contained in the lienholder agreement records, Forest Guardians' election to restrict the specific scope of relief requested in its motion for summary judgment to some but not all of that same information is consistent with the information sought in Forest Guardians' original requests to the BLM.  Given the BLM's duty and opportunity to consider Forest Guardians' claims that at least some of the information contained in the lienholder agreement records was not exempt from release under the FOIA, Forest Guardians did not fail to exhaust its administrative remedies by requesting in its summary judgment motion that the Court order the release of some but less than all of that same information under the FOIA.

The BLM argues that, if the Court decides to grant Forest Guardians' fee waiver request and finds that the records in question are not exempt under Exemption 6, the Court should remand the case to the BLM so it can determine whether the information now requested is reasonably segregable and whether disclosure is prohibited by other FOIA exemptions.  With respect to the segregability of the requested information, the agency has already had the opportunity to consider that issue.  With respect to the applicability of other exemptions, the BLM conceded at oral argument that it does not believe that other exemptions prevent disclosure of the requested information under the FOIA.  See Transcript at 60:9 to 61:13.  Because Forest Guardians has exhausted its administrative remedies with regard to the information sought in this action, no further purpose would be served by allowing the BLM to reconsider these issues.

**B.      FOREST GUARDIANS DOES NOT NEED TO AMEND ITS COMPLAINT.**

The information that Forest Guardians seeks in this proceeding is contained in the BLM's lienholder agreement records that Forest Guardians sought in its original FOIA requests.  Forest

Guardians seeks the same general relief that it requested in its Complaint. See Complaint ¶ 23(a) at 5 (seeking a declaration that the BLM "fail[ed] to provide all reasonably segregable non-exempt information sought in [Forest Guardians' FOIA] request"). Thus, the information of which Forest Guardians seeks disclosure under the scope of relief outlined in its motion for summary judgment is consistent with both the information sought in its FOIA requests and in the general relief sought in its Complaint.

That Forest Guardians now seeks the release of some but less than all of the information within the scope of its FOIA request or its Complaint is procedurally irrelevant. The BLM does not cite any legal support for the proposition that a plaintiff must amend its pleadings to narrow -- rather than expand -- the scope of relief sought in its original complaint during litigation, so long as the relief sought is consistent with the general relief prayed for in the complaint. The Court has also not found any authority for that proposition.

A plaintiff generally must amend its complaint if it later seeks to add another party or proceed under a new or additional cause of action. Similarly, if a party seeks to expand the scope of relief sought in its original complaint in either amount or the nature of what is prayed for, it would violate fundamental fairness and the purpose of notice pleading for the law to not require a formal amendment to the pleadings. These are common situations; in those, a party must seek leave from the Court to amend its pleadings once a defendant files a responsive pleading.

This case, however, presents the opposite situation. Forest Guardians does not seek to expand its scope of relief but to narrow it. Two cases from the Tenth Circuit lend support to the conclusion that the terms of the prayer for relief in the Complaint do not bind Forest Guardians. See Preas v. Phebus, 195 F.2d 61, 63 (10th Cir. 1952)("But the prayer forms no part of the cause of

-22-

action.  One is entitled to the relief made out by the allegations of the complaint."); Schoonover v. Schoonover, 172 F.2d 526, 530 (10th Cir. 1949)("The prayer of the first count or cause of action asking for reformation of the contract may be disregarded because it is recognized, without exception, that the prayer forms no part of the cause of action, and that a pleader will be entitled to the relief made out by the case and stated in the pleadings, irrespective of what is asked for in the prayer."). The Court believes that it puts form over substance to say that a plaintiff must amend its complaint to limit the scope of relief it seeks in a proceeding.

In addition, the parties and the Court have previously considered such a narrowing of Forest Guardians' requested relief.  Counsel for both Forest Guardians and the BLM discussed this issue with Judge Parker at the scheduling conference in this matter.  At that time, Judge Parker asked that, if possible, Forest Guardians' counsel should try to determine whether his client would elect to narrow the scope of relief sought before the time that briefing was to take place and inform the Court by letter.  Forest Guardians did not make that decision until the time it filed its motion for summary judgment.  The Court did not, however, indicate that it would require  Forest Guardians to request leave to formally amend its Complaint to limit the scope of relief sought.  That relief is still consistent with the general relief sought in the Complaint.

## II.    THE TWO CATEGORIES OF INFORMATION THAT FOREST GUARDIANS SEEKS UNDER THE LIMITED SCOPE OF RELIEF REQUESTED IN THIS PROCEEDING ARE NOT EXEMPT FROM RELEASE PURSUANT TO FOIA EXEMPTION 6.

The BLM bears the burden of showing that the information falls within one of the FOIA's exemptions.  Here, the BLM has not shown that the release of the limited information that Forest Guardians seeks would constitute, in the words of Exemption 6, a "clearly unwarranted invasion of

personal privacy."  FOIA requires the BLM to redact the requested copies of lienholder agreements and to release all non-exempt information.

###### A.    THE BLM HAS THE BURDEN OF SHOWING THE INFORMATION FALLS WITHIN A STATUTORY EXEMPTION.

The FOIA generally provides that the public has a right of access, enforceable in the court, to federal agency records.  See Anderson v. Department of Health & Human Servs., 907 F.2d 936, 941 (10th Cir. 1990).  That right of access is subject to nine specific exemptions.  See id.; 5 U.S.C. §552.  The Act's basic purpose is to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  Id. (quoting NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978)).  To achieve that goal, Congress designed the FOIA to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  Anderson v. Department of Health & Human Servs., 907 F.2d at 941 (quoting Wren v. Harris, 675 F.2d 1144, 1145 (10th Cir.1982)(in turn quoting Department of the Air Force v. Rose, 425 U.S. 352, 361 (1976)).

Because the FOIA's essential purpose is to promote public disclosure of agency records, the Act is to be broadly construed in favor of disclosure, and its exemptions are to be narrowly construed. See Audubon Soc'y v. U.S. Forest Service, 104 F.3d 1201, 1203 (10th Cir. 1997)(citing Anderson v. Department of Health & Human Servs., 907 F.2d at 941).  Therefore, a federal agency resisting disclosure under the FOIA bears the burden of justifying non-disclosure.  See id. (citing Anderson v. Department of Health & Human Servs., 907 F.2d at 941).  In any action challenging an agency's withholding of records, "the burden is on the agency to sustain its action."  5 U.S.C. § 552(a)(4)(B). District courts review an agency determination regarding disclosure under a de novo standard.  See

-24-

id.

**B.     RELEASE OF THE INFORMATION FOREST GUARDIANS SEEKS IN THIS CASE WOULD NOT CONSTITUTE A "CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY."**

The sole stated basis for the BLM's refusal to release any information contained in the lienholder agreements sought in Forest Guardians' FOIA requests is Exemption 6.  Exemption 6 permits the government to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]"  5 U.S.C. § 552(b)(6).  Exemption 6 applies to "Government records on an individual which can be identified as applying to that individual."  United States Dep't of State v. Washington Post Co., 456 U.S. 595, 602 (1982)).  The exemption's language requires courts to balance the public interest in disclosure against the interest Congress intended the exemption to protect.  See Sheet Metal Workers Intern. Ass'n, Local No. 9 v. United States Air Force, 63 F.3d 994, 996 (10th Cir. 1995).

In applying Exemption 6, "a court must identify the privacy interest served by withholding information and then the public interest that would be advanced by disclosing it.  Having done so, the court must determine 'whether, on balance, disclosure would work a clearly unwarranted invasion of personal privacy.'"  Painting & Drywall Work Pres. Fund, Inc. v. Dept. of Housing & Urban Dev., 936 F.2d 1300, 1302 (D.C. Cir. 1991)(citation omitted).  The Tenth Circuit Court of Appeals has defined the "public interest" in FOIA disclosures, as "the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to the public understanding of the operations or activities of the government.'"  Sheet Metal Workers Intern. Ass'n, Local No. 9 v. United States Air Force, 63 F.3d at 996.  In making a determination whether the BLM may withhold information from Forest Guardians under Exemption 6, the Court must balance any privacy interest

which the individual grazing permittees involved in the practice of using BLM grazing permits as collateral for private loans may have in nondisclosure against the "extent to which disclosure of the information sought would she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." Id. at 997 (citation and internal quotation marks omitted).[6]

Both the BLM and the Intervenors concede that release of the identities of those financial institutions who benefit from the BLM's facilitation of the use of lienholder agreements would not constitute a clearly unwarranted invasion of personal privacy as required to justify withholding such information under Exemption 6 of the FOIA. See Transcript at 50:19 to 51:3; id. at 61:21-25. While the Defendants protest the disclosure of loan amounts by field office, the Forest Service and the Intervenors agreed to the disclosure of similar information in the earlier case. Given that the Intervenors agreed to the disclosure of the requested information in Forest Guardians v. United States Forest Service, it is difficult for the BLM and the Intervenors to argue that all the information in the lienholder agreements is exempt from disclosure under the FOIA. See Forest Guardians v. United States Forest Service, Memorandum Opinion and Order at 41-45.

Judge Mechem did not find that the names of financial institutions involved in the use of "escrow waivers" were exempt from release under the FOIA. Judge Mechem later approved a stipulation between Forest Guardians and the Forest Service which provided for the public release of the names of financial institutions making loans to grazing permittees using public lands as

---

[6] The Court need not decide whether all of the information in the lienholder agreements is exempt from mandatory disclosure. As discussed previously, Forest Guardians has elected to narrow the scope of relief sought in this proceeding to avoid public disclosure of the identities and personal financial information of individual grazing permittees.

collateral.  The BLM has not offered factual evidence or testimony in support of the agency's contention that the release of the names of the financial institutions would violate Exemption 6.  The BLM has not sustained its burden of proof under the FOIA to justify its withholding of such information.

The Intervenors argue that, after conducting the balancing test, the Court in Forest Guardians v. United States Forest Service concluded that the public interest in disclosure of the information did not outweigh the invasion of personal privacy that would result from such disclosure.  See Memorandum Opinion and Order at 41.  But Judge Mechem was commenting on the individual names and the loan amounts.  See id.  Forest Guardians' more narrow scope of relief sought somewhat mutes Judge Mechem's comments on information not sought here.  While Judge Mechem specifically held that identification of mortgage amounts was exempt from disclosure under Exemption 6, he did so in the context of a request to disclose many other items of information as well, including the names of individual permittees.  See id. at 44.  Because this case would involve the disclosure of loan amounts without any information identifying the individual permittee, this Court finds that the disclosure of the individual loan amounts would not lead to an unwarranted invasion of privacy.

The Intervenors argue that, even if the BLM redacted all other information on the "lienholder agreements," except the names of the banks and the individual loan amounts, Forest Guardians could still trace the information to individual permittees.  Most allotments are grazed by an individual or a limited number of permittees.  The Intervenors assert that, if the BLM releases the loan amounts for individual allotments, it would not be very difficult for the Forest Guardians to trace this information to specific permittees.

The BLM and the Intervenors bare the burden of establishing this risk.  There are 110 field offices.  See Declaration of Kenneth Visser ¶ 8, at 3.  There are 18,088 permittees.  See id.  The BLM estimates that about 75% of the permittees, or 13,566 of them use their permits as collateral.  See id. ¶ 9, at 3.  Accordingly, on average, there will be 164 permittees per field office, and about 123 will use their permits as collateral.  Neither the BLM nor the Intervenors were able to identify a field office with only one permittee.  See Transcript at 56:6-10; id. at 65:14-23.  Neither Defendant was able to state what minimal number of permittees in a field office -- 1, 2, 10, etc. --  would make it possible for Forest Guardians to link an individual permittee with the disclosed information.  See id. at 56:25 to 57:8.  Hence, the BLM and the Intervenors have not met their burden of showing that the release of this redacted information would be a "clearly unwarranted invasion of personal privacy" of any permittee.

The Court will minimize the risk by requiring the BLM to disclose information on the field office level rather than the allotment level.  The Court will further order that if there are field offices with only one permittee, he or she can be joined with the adjacent field office with the fewest number of permittees.  With this provision, no field office will have only one permittee.  Given these safeguards, neither the BLM nor the Intervenors have established that Forest Guardians can connect the disclosed information with a particular permittee.

There is minimal legitimate privacy interest in withholding information concerning the identity of the lending institutions because that information is in the public domain.  This information is already available to Forest Guardians because the banks have filed lienholder agreements in courthouses across the western United States.  See Transcript at 78:5-10.  The two affiants that signed the affidavits that the Intervenors submitted to the Court gave the name of the financial

institution with which they had loans.  See Declaration of Randall G. Major ¶ 7, at 2; Declaration of Jim Embree ¶ 6, at 1-2.  The Wall Street Journal article that the Intervenors submitted contains information regarding the amount of a particular rancher's loan and the financial institution that loaned him the money.

In contrast, there is a legitimate public interest in disclosure of the details of the BLM's practice of facilitating the use of lienholder agreements to collateralize public lands grazing permits. If nothing else, approximately 13,500 pieces of paper -- or whatever that number will be -- will cast some light on how much clerk time and taxpayer dollars the BLM spends in maintaining these records and files.  It will also show in which field offices the BLM may have to concentrate more resources to do this task.

When weighed against the legitimate public interest in disclosure of the details concerning the amount of government resources required to support the BLM's facilitation of the collateralization of public lands grazing permits, there is minimal legitimate privacy interest in withholding the information that Forest Guardians seeks.  The redacted lienholder agreements would assist Forest Guardians and thus the public, in identifying the aggregated financial value of the loans those lenders have issued using BLM permittees' privileges to graze public lands as collateral for private loans. Disclosure of such aggregated loan amounts, by BLM field office, will allow the public to determine the overall geographic scope of the BLM's facilitation of lienholder agreements, and also the level of financial stake that private lenders acquire and have in keeping the maximum number of cows grazing on particular groups of grazing allotments on the public's BLM lands.  The BLM can make this disclosure while protecting any arguably private personal financial or other information concerning individual BLM grazing permittees.

In addition, the settlement in Civ. No. 99-615 demonstrates that information in such records, when appropriately redacted, can be disclosed without violating the privacy rights of individual grazing permittees.  Therefore, the BLM and the Intervenors have not demonstrated that releasing appropriately redacted copies of lienholder agreements will constitute a "clearly unwarranted" invasion of personal privacy as required to permit withholding those records under FOIA Exemption 6.  The Court and Forest Guardians have gone to great lengths to avoid any invasion and, given the record before the Court, the disclosure will not be "clearly" an invasion of personal privacy. Moreover, even if the release of the requested information would result in some invasion of the permittees' personal privacy, an assertion with which the Court does not agree, the invasion will not be substantial or "unwarranted."

**C.   THE FOIA REQUIRES THE BLM TO REDACT THE REQUESTED COPIES OF LIENHOLDER AGREEMENTS AND TO RELEASE ALL REASONABLY SEGREGABLE NON-EXEMPT INFORMATION.**

Under the FOIA, the BLM and other agencies have an obligation to appropriately redact copies of any records responsive to a FOIA request so that any and all non-exempt information which is reasonably segregable is released.  See 5 U.S.C. § 552(b).  The BLM has not met its burden under the FOIA of demonstrating that it has released all reasonably segregable non-exempt information within the scope of Forest Guardians' request.  The BLM refused to release any information.  Thus, the BLM unlawfully withheld reasonably segregable, non-exempt portions of agency records that were responsive to a FOIA request.

Therefore, in accordance with the limited scope of relief that Forest Guardians specifically requests in this proceeding, the Court will order the BLM to appropriately redact any personal financial or other information from the requested lienholder agreements which might arguably reveal

private information concerning any specific individual grazing permittee, and to release, organized by BLM field office, redacted copies of the lienholder agreements which disclose only: (i) the identities of all institutional lenders using BLM grazing permits as collateral, and (ii) the amount of each loan involved.  From those redacted records, Forest Guardians can compute for itself the aggregate amount of loans covered by lienholder agreements for each BLM field office to determine reasonably specific information concerning the geographic and financial scope of the use of lienholder agreements on public lands in the western United States, without the ability to identify the amount of any specific grazing permittee's loan.  In the event that a field office contains only one permittee, that lienholder agreement shall be disclosed along with information from the adjacent field office containing the lowest number of permittees.

The Intervenors contend that Forest Guardians is seeking a document in this case similar to the one that the Forest Service created in the prior case.  The Intervenors suggest that Forest Guardians no longer wants copies of the lienholder agreements and that the document which Forest Guardians seeks does not currently exist.  They argue that, because the Court cannot compel the BLM to create the record that the Forest Service agreed to produce, the Court cannot grant the relief that the Forest Guardians requests in its motion for summary judgment.

The Intervenors are correct that, under the FOIA, the Court cannot compel the BLM to create a new document.  See Kissenger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 152 (1980)(holding that the FOIA "does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained.").  The United States Court of Appeals for the Tenth Circuit has acknowledged this line of authority.  See Poll v. U.S. Office of Special Counsel, 208 F.3d 226, 2000 WL 14422, *5 (10th Cir. 1999)(unpublished

opinion).  Accordingly, the Court will not compel the BLM to create a new document.

If the agency prefers, however, it may compute such aggregated loan information itself as the Forest Service agreed to do in its settlement of Civ. No. 99-615.  Forest Guardians is willing to accept a spreadsheet or other document that the BLM prepares to disclose, organized by BLM field office, the identities of all institutional lenders involved in the use of lienholder agreements using BLM grazing permits, along with the aggregated amount of loans shown by the lienholder agreements affecting the grazing allotments that each field office administers.  Thus, although the Court will not require the BLM to create a new document to respond to Forest Guardians' request, the agency is free to do so if it chooses.  If it does so, it need not produce individual lienholder agreements.  Such a document virtually eliminates the risk of linking any disclosed information to a particular permittee.

## III.   FOREST GUARDIANS IS NOT ENTITLED TO A FEE WAIVER UNDER THE FOIA.

The FOIA requires that federal agencies provide documents without any charge or at a reduced fee whenever certain statutory requirements are met.  The FOIA sets forth the following standard for the grant of a fee waiver:

> Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

5 U.S.C. § 552(a)(4)(A)(iii).  The FOIA also requires agencies to establish guidelines for determining when they should waive or reduce fees.  See 5 U.S.C. § 552(a)(4)(A)(i).  The party requesting a fee waiver has the burden of establishing entitlement to such a waiver.  See 43 C.F.R. § 2.19(a).

Congress amended FOIA to ensure that it be "'liberally construed in favor of waivers for

noncommercial requesters.'" McClellan Ecological Seepage Situation v. Carlucci, 835 F.2d 1282,

1284 (9th Cir.1987)(quoting 132 CONG. REC. 27,190 (1986) (Sen. Leahy)).  The legislative history,

however, does not presumptively require an agency to waive fees in response to a request from a

public interest group.  See McClellan Ecological Seepage Situation v. Carlucci, 835 F.2d at 1284.

To the contrary, the FOIA's legislative history makes plain that public interest groups must satisfy

the same statutory test that applies to all requesters: "Although public interest groups do not fall

within the most favorable fee category, all public interest groups -- regardless of their status or

identity or function -- will be able to qualify for fee waivers and thereby obtain documents without

charge if their requests meet the standard for waivers."  132 CONG. REC. H9463 (Oct. 8, 1986) (Rep.

English).

       In the event that an agency denies a request for a fee waiver, the requester is entitled to

judicial review of the denial.  See 5 U.S.C. § 552(a)(4)(A)(vii).  The FOIA establishes the standard

for judicial review of a fee waiver denial.  See id.  "In any action by a requester regarding the waiver

of fees under this section, the court shall determine the matter de novo: Provided, [t]hat the court's

review of the matter shall be limited to the record before the agency."  Id.  The initial FOIA request

and the agency's denial letter serve as the primary sources of information regarding the agency

record.  See 43 C.F.R. § 2.19(a)("The bureau will rely on the fee waiver justification you have

submitted in your request letter.  If you do not submit sufficient justification, your fee waiver request

will be denied."); id. at § 2.19(c)("If a bureau denies your request for a fee waiver, it will notify you,

in writing, of the following: (1) The basis for the denial, including a full explanation of why your fee

waiver request did not meet DOI's fee waiver criteria[.]").

       None of the parties dispute that the requested information is not primarily in the commercial

interest of Forest Guardians.  The parties agree that the appropriateness of a fee waiver depends on whether disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government.  In accordance with the Department's regulations, in assessing whether the requester has met the first part of the fee waiver test, the agency is to consider the following criteria: (i) whether the records concern the operations or activities of the government; (ii) whether disclosure is likely to contribute to public understanding of those operations and activities; and (iii) whether the contribution to public understanding will be significant.  See 43 C.F.R. Part 2, App. D.

The Forest Guardians do not contend that the BLM used an improper test in considering its fee waiver request.  See FOIA Response at 2.  Further, Forest Guardians does not argue that the BLM incorrectly identified the relevant factors that it should have considered in applying the test. See id. at 2-4. Rather, the issue before the Court is whether the BLM properly applied the test and correctly denied the fee waiver.  Because the Court finds that Forest Guardians' request would not contribute significantly to public understanding of the operations or activities of the government, the Court will deny Forest Guardians' motion for summary judgment with respect to the fee waiver request.

**A.    THE REQUESTED RECORDS CONCERN GOVERNMENT OPERATIONS OR ACTIVITIES.**

The BLM argues that Forest Guardians cannot meet the first factor of the public interest test because the collateral assignments do not concern the operations or activities of the government.  The collateral assignments document lending relationships between two parties separate and distinct from the BLM: the grazing permittee and the financial institution.  Private parties, generally lenders, submit

the collateral assignments voluntarily to the BLM.  The BLM is not a party to the loan agreement and takes no part in the loan's negotiation or approval.

While the BLM is not directly involved in the transaction, and does not have any control over the process by which the parties reach their agreement, the BLM's policies facilitate the loan process between the lenders and grazing permittees by first doing nothing to discourage the practice and by, in fact, assisting both sides of the transaction.  The BLM accepts voluntary notices of the collateral assignments to use in two situations: (i) if the permittee proposes to transfer the permit; or (ii) if the BLM proposes an action that might affect the value of the permit.  The BLM's agreement to notify the lender of record if the BLM proposes to take action on a permit that will affect the permit's value, or if the permittee wishes to transfer the permit, facilitates the loan process, especially for the lenders. The BLM's involvement in the process makes it safer and easier for financial institutions to accept grazing permits as collateral.  The acceptance and filing of collateral assignments submitted by third parties involves some BLM action or activity; what BLM does with the documents also involves governmental operations and activities.

When it filed its initial FOIA requests, Forest Guardians requested copies of correspondence between the BLM and lenders regarding proposed actions on grazing allotments.  Forest Guardians, however, did not pursue this portion of its requests in its administrative appeals, and it is accordingly not at issue before the Court.  In this proceeding, Forest Guardians seeks only a limited amount of information: the names of financial institutions and the amount of loans.  While the agency records that contain this information, if released to the public pursuant to the FOIA, will shed light on a United States Department of Interior policy of allowing holders of public lands grazing permits to use them as collateral for private loans, it sheds only a small amount of light on government "operations

and activities."

The Court does not doubt that the information sought will be of public interest. The financial institutions base their loans, at least in part, on the number of cows that the BLM allows the permittees to graze on the public lands under the grazing permits. As a result of the BLM policy of facilitating the use of lienholder agreements, the BLM allows grazing permittees to create security interests in favor of private lenders, which give those lenders a financial stake in the amount of grazing that the agency permits on public lands. The BLM, by facilitating the collateralization of public lands grazing privileges by private parties, fosters both the expectation and economic pressure on the part of both grazing permittees and their lenders to pressure the BLM to maintain the highest possible levels of grazing on the allotments used as collateral under the agency's collateral assignment program.[7]

But just being information of a public interest is not enough. The information must likely contribute to public understanding "of the operations and activities of the government . . . ." And here, Forest Guardians has so narrowed its request that the requested information reveals more about the financial relationships between the financial institutions and the permittees than it does about the government. Nevertheless, the BLM concedes that its activities include a responsibility for maintaining lienholder records submitted to it by third parties which document the use of public lands grazing permits as collateral for private loans made to ranchers. Although the submission of such

---

[7] Public lands grazing permits are privileges and not rights. See, e.g., Federal Land Legal Consortium v. United States, 195 F.3d 1190, 1196 (10th Cir. 1999). The issue of livestock grazing on BLM and other public lands in the western United States is a matter of growing public controversy and significance. There is significant public interest and concern about the harm to water quality, fish, and wildlife on the public lands from overgrazing. Because the BLM is the agency entrusted with overseeing and managing public lands and BLM resources are spent in an effort to maintain the government's role in the lienholder agreement program, the release of the requested information does concern the operations and activities of the government.

information is voluntary, the BLM also acknowledges that the Department of Interior's grazing regulations require it to notify lienholders of record whenever the agency receives an application to transfer a grazing permit from one base property to another and whenever the agency takes action that might affect the permit's value.  While the requested information may not reveal much about government operations, it does disclose, by field office, the number of times -- approximately 13,500 times -- a publicly funded clerk is placing these lienholder agreements in the files, and which fields offices are doing so the most and which are doing so the least.

In light of the BLM's responsibility for maintaining such lienholder agreement records and notifying lienholders of any actions which might be taken that could affect the value of the permit, such records do concern the activity's operations and activities.  In engaging in these activities, the BLM involves itself in the practice of facilitating the use of such lienholder agreements.  See Black's Law Dictionary at 591 (6th ed. 1990)(defining "facilitate" as "to free from difficulty or impediment").  The practical result of the BLM's activities is that public funds and resources are used to facilitate the practice of accommodating financial institutions who make private loans using the privilege to graze on public lands as collateral.  Not only does the public pay for the BLM to maintain such records, but the United States expends public funds notifying lenders whenever any action might be taken which might affect the value of a BLM grazing permit.  Therefore, the records that Forest Guardians seeks concern the BLM's operations and activities in accommodating and facilitating the use of grazing permits as private collateral.

## B.   DISCLOSURE OF THE REQUESTED INFORMATION IS LIKELY TO CONTRIBUTE TO PUBLIC UNDERSTANDING OF THE OPERATIONS AND ACTIVITIES OF THE GOVERNMENT.

The BLM contends that the disclosure of these records in the form in which Forest Guardians

-37-

now seeks them -- limited to the names of financial institutions and to individual or aggregate loan amounts by BLM field office -- does not meet the second factor of the public interest test.  The BLM contends that Forest Guardians' attempt to have the records segregated makes the grant of a fee waiver even less warranted than its initial requests.  The BLM contends that the information that Forest Guardians now seeks is not "meaningfully informative on the . . . bureau's operations and activities[.]"  43 C.F.R. Pt. 2, App. D (b)(2)(i).

The BLM argues that there is nothing in a list of the names of financial institutions that concerns the manner in which the BLM manages rangelands or casts any light on BLM operations or activities.  The BLM contends a list of the names of banks, without more, is not meaningfully informative about BLM's management of the grazing program.  For the same reason, the BLM argues that the release of loan amounts does not concern government activities.  The BLM is not a party to the loans and does not approve or oversee the lending agreements.  The BLM contends that, whether aggregated by field office or on any other basis, the loan figures provide no information on the manner in which the BLM manages the grazing program.  The BLM maintains that these figures are irrelevant to any questions that Forest Guardians may wish to pursue in its efforts to inform the public regarding the extent to which the BLM consults and considers the lenders' views in BLM activities.

Forest Guardians argues that the records that it seeks to have released under the FOIA will be meaningfully informative on the BLM's operations and activities.  The information will reveal to the public the identity of lenders who benefit from the BLM's activities in maintaining and facilitating the use of lienholder agreements on public lands, as well as the general financial and geographic scope of those lenders' stake in the management of the public's BLM lands.  Forest Guardians contends that

the media coverage given to the settlement in Civ. No. 99-615 and to the information that the Forest Service released to Forest Guardians under the FOIA in that case corroborates that such aggregated financial information is publicly significant.

While it may be true that the information is publicly significant in that the public is interested in knowing about certain political pressures that may be at work with respect to public lands management, the information sheds much more light on the operations and activities of private lending institutions and citizens than on those of the government. Nevertheless, as noted earlier, the limited, redacted records are informative regarding the agency's activities in helping to facilitate the process of lending based on the collateralization of public grazing lands. The redacted documents will show, to some degree, how much government effort is devoted to this task.

Forest Guardians has "the ability and intention to disseminate the information to the general public or a reasonably broad audience of persons interested in the subject[.]" 43 C.F.R. Pt. 2, App. D (b)(2)(iv). Forest Guardians' initial FOIA request states that the organization "disseminates the information it obtains, including all information obtained pursuant to FOIA, in various effective ways." FOIA Request at 1. The request goes on to describe the ways that Forest Guardians has disseminated information to the public in the past, including making records available for review in the organization's office, an on-line newsletter, and mainstream news coverage. See id. While the contribution to public understanding of agency operations and activities may not be great, it does exist. Thus, Forest Guardians satisfies the second prong of the BLM's criteria for determining whether to grant a fee wavier.

**C.    ALTHOUGH THE REQUESTED DISCLOSURE IS LIKELY TO CONTRIBUTE TO PUBLIC UNDERSTANDING OF GOVERNMENT OPERATIONS AND ACTIVITIES, THAT CONTRIBUTION WOULD NOT BE SIGNIFICANT.**

Forest Guardians argues in its administrative appeals that, by facilitating the use of lienholder agreements and thereby assisting financial institutions to collateralize the privilege of grazing on public lands, the BLM is ensuring that those same financial institutions will use their substantial resources to exert significant pressure on the agency to maintain maximum levels of livestock grazing on the public lands despite possible detrimental effects or other land management concerns or values which may be present.  See FOIA Appeal at 2.[8]  Forest Guardians argues that the collateral assignments concern government operations by showing the extent to which the loans to permittees influence the BLM's management of the grazing program.  Furthermore, Forest Guardians contends that the information sought is publicly significant in that it will shed light on the financial and geographical scope of the collateralization of public lands, as well as the identity of those financial institutions who have adopted a policy, which the BLM facilitates, of using public lands grazing privileges as collateral for private loans.

Forest Guardians may be correct that this information is publicly significant.  It does not appear, however, that the information will significantly inform the public regarding governmental activities and operations.  The information would instead inform the public of the financial and

---

[8] These arguments were not specifically raised in Forest Guardians' initial FOIA request,  nor addressed in the agency's response to that request.  While the Court addresses them because Forest Guardians at some future point characterized them as simply more detailed explanations of the broad propositions contained in the original request, the fact that they were not before the BLM when Forest Guardians made its original fee waiver request provides an additional reason for finding that Forest Guardians has not met its burden on establishing entitlement to the fee waiver.  See 5 U.S.C. § 552(a)(4)(A)(vii); 43 C.F.R. § 2.19(a).

geographical scope of the activities of private lending institutions and permittees.[9]  Moreover, the information sought is already publicly available.  See 43 C.F.R. Pt. 2, App. D (b)(3)(iv)("If the Government previously has published the information you are seeking or it is routinely available to the public in a library, reading room, through the Internet, or as part of the administrative record for a particular issue (e.g., the listing of the spotted owl as an endangered species), it is less likely that there will be a significant contribution from release.").  Thus, such information does not meet the FOIA's fee waiver criteria in that it does not "contribute significantly to public understanding [of the operations or activities of the BLM.]"  43 C.F.R. Pt. 2, App. D (b)(3).

The BLM correctly argues that, even if the agency's facilitation of the use of grazing permits as collateral is of public significance or interest, any additional details concerning the actual financial and geographical scope of such lienholder agreements will not contribute significantly to public understanding of the BLM's actual operations or activities.  Specifically, the BLM is correct that the disclosure of names of financial institutions and of loan amounts would not add significantly to the knowledge that Forest Guardians and the public already have regarding the grazing program.  See Forest Guardians v. United States Forest Service, Civ. No. 99-615, Memorandum Opinion at 44.  The BLM accurately notes that, as in Forest Guardians v. United States Forest Service, the information sought here is already before the public, in courthouses across the west, newspaper articles, and affidavits.

---

[9] Forest Guardians' broader original FOIA request was arguably more directly related to operations and activities of the government.  See FOIA Request at 1 (requesting "[a]ny and all letters from financial/lending institutions concerning livestock grazing on BLM lands" and "[a]ny and all letters from the BLM to financial/lending institutions concerning management of livestock grazing on public lands.").  Forest Guardians' more narrow scope of relief in this proceeding, however, no longer seeks correspondence to or from the BLM directly addressing grazing management.

The BLM correctly identifies the considerations involved in determining whether the release of requested records will contribute *significantly* to public understanding of government operations and activities. See 43 C.F.R. Pt. 2, App. D (b)(3)(i-iv). The regulation directs agencies to consider factors such as (i) whether the information being disclosed is new; (ii) whether the information being disclosed will confirm or clarify data which has been released previously; (iii) whether disclosure will increase the existing level of public understanding of the operations or activities of the Department or a bureau; and (iv) whether the information is already publicly available. See id.

The Taylor Grazing Act and the Department's implementing regulations recognize that grazing permittees may use their permits as collateral. Forest Guardians demonstrates its knowledge of collateralization in its brief in support of summary judgment and in its appendix to the summary judgment brief. The copy of the State Bank of Southern Utah's amicus brief in Public Lands Council v. Babbitt states that the amicus "is an individual financial institution which has extended credit to public land ranchers and which, along with other financial institutions, holds an estimated $10 billion dollars in loans and related credit transactions to the public land ranching industry." Id. at 1. The public is aware that this program exists, and that it exists on a large scale. See Carlton, Jim, "Aiming to Save Species Hurt by Grazing Cattle, The Forest Guardians Target Ranchers in Debt," Wall Street Journal (dated November 11, 2002)( stating that "[u]nder the program, the U.S. government provides banks with verification of ranchers' grazing permits, so banks can accept the numbers of livestock allowed to feed under the permits as collateral for business loans. In the past 20 years, banks have issued more than $ 450 million in grazing-permit loans to about 300 ranching operations, according to records obtained by the Guardians."). There is little, if anything, added to the information already available to the public by granting Forest Guardians a fee waiver to release names of the financial

institutions making the loans and specific or aggregate loan figures by BLM field office.

D.     **CONCLUSION**

The FOIA is intended to promote disclosure of information that sheds light on the activities of the government, not disclosure of information involving private citizens that happens to be stored in government files.  In this case, the lienholder agreements document legal financial relationships between private individuals and private corporations.  The extent of the government's involvement in these otherwise entirely private transactions is to receive and maintain voluntarily filed documents and notify lienholders when any action (governmental or private) may affect the value of the collateral.  Thus, while disclosure of the requested information may be likely to contribute to some public understanding of government operations and activities by shedding some light on the amount of governmental resources that the BLM expends in maintaining those files, it is not likely to significantly inform public understanding about what the BLM does.  The public will not learn much new about the BLM's operations.  Any significant increase in the level of public understanding would relate to the operations and activities of private citizens and lending institutions, not the government.

Accordingly, the BLM's refusal to grant Forest Guardians' fee waiver request contained in its original FOIA requests was proper.  The Court's review of the fee waiver information that Forest Guardians submitted with both its original FOIA requests and with its administrative appeals demonstrates that Forest Guardians does not fulfill the FOIA's requirements to establish the organization's eligibility for a fee waiver.  And although Congress intended the 1974 amendments to the FOIA's fee waiver provisions to insure that agencies should not use fees for the purpose of discouraging requests for information or as obstacles to disclosure of requested information, see S. Rep. No. 1200, 93d Cong., 2d Sess. (1974)(Conference Report), Congress contemplated that

requesters must affirmatively establish that the requested information would significantly contribute to the operations and activities of the government, see 132 CONG. REC. H9463 (Oct. 8, 1986)(Rep. English)("[A]ll public interest groups . . . will be able to qualify for fee waivers and thereby obtain documents without charge *if* their requests meet the standard for waivers.")(emphasis added).

It may be true, as explained in Forest Guardians' administrative appeals, that the public has an interest in knowing how much money and who is involved in arrangements involving the collateralization of public lands. That standard, however, is not the test under the FOIA. Forest Guardians' FOIA request, as supplemented by the information in its subsequent administrative appeals, did not provide sufficient information to allow the BLM to determine that public disclosure of at least some of the information sought would be likely to contribute significantly to the public's understanding of BLM's operations and activities. Therefore, based on all of the information that the Forest Guardians submitted to the BLM in support of its fee waiver request, the Court concludes that public disclosure of the information sought is not likely to contribute significantly to public understanding of the BLM's operations and activities. The Court therefore will deny Forest Guardians' motion for summary judgment with respect to the fee waiver request.

**IT IS THEREFORE ORDERED** that the Plaintiff Forest Guardians' Motion for Summary Judgment is granted in part and denied in part.

With respect to the issue whether the requested documents are protected from disclosure under FOIA Exemption 6, the Court grants the motion for summary judgment and orders that the BLM shall release appropriately redacted copies of the agency's lienholder agreement records to Forest Guardians disclosing the following information: (i) the identity of financial institutions involved in the practice of lending to BLM grazing permittees using the permittees' grazing privileges as

collateral; and (ii) the total amount of each individual loan.  Names, addresses, and specific details regarding each loan are not to be released.  The BLM shall organize the redacted lienholder agreements by field office and disclose the records to Forest Guardians in that manner.  In the event that any field office contains only one permittee, the BLM shall disclose that lienholder agreement along with records from the adjacent field office containing the lowest number of permittees.  At the agency's discretion, it may compile aggregate loan totals for each field office as an alternative to releasing individual lienholder agreements.

With respect to the issue whether Forest Guardians is entitled to a fee waiver under the FOIA, the Court denies the motion for summary judgment and orders that the BLM may properly assess fees related to Forest Guardians' request pursuant to the applicable statutory and regulatory authority.


_____
UNITED STATES DISTRICT JUDGE


Counsel:

Richard J. Mietz
Santa Fe, New Mexico

        Attorney for the Plaintiff


David C. Iglesias
   United States Attorney
Manuel Lucero
   Assistant United States Attorney
Albuquerque, New Mexico

        Attorneys for the Defendant

Hugo Teufel III
Robin Friedman
Jean Sonneman
Office of the Solicitor
U.S. Department of the Interior
Washington, D.C.

  Of Counsel to the Defendant


Lee Peters
Hubert & Hernandez
Las Cruces, New Mexico


Karen Budd-Falen
Richard W. Walden
Budd-Falen Law Offices, P.C.
Cheyenne, Wyoming

  Attorneys for Defendant-Intervenors